*Zeynab Abdullahi v. Gianni Zanini*, No. 2390, September Term, 2017.


ACQUIESCENCE RULE; MONETARY AWARD; DISSIPATION; CONTRIBUTION; MARITAL SHARE OF A PENSION


The general rule is that a party may not acquiesce in a judgment and accept its benefits while attacking the judgment on appeal. There are, however, exceptions to this general rule. One exception exists where the judgment is "'for less than the amount or short of the right claimed.'" Additionally, where Husband told Wife that he would not raise the acquiescence rule, Husband waived any right to argue that the acquiescence rule requires dismissal of this appeal.

In assessing whether to grant a monetary award, a court must determine the value of all property. In assessing the value of marital bank accounts, the court errs in dividing accounts listed in one party's name because that constitutes an improper transfer of ownership.

With respect to 529 college accounts in one party's name, where there is nothing to suggest custodian of the funds, which are held for the benefit of a child's college education, will use the funds for another purpose, it is improper to consider the funds as assets of that parent in determining a monetary award.

Where the parties disagree on the value of property, and owner of property presents evidence that the property has no value, the circuit court errs in accepting another party's bald assertion of value in the Joint Statement, which is unsupported by any reasoning supporting that value.

Proof that a spouse made large withdrawals from bank accounts under his or her control, here $39,000 in one year, was sufficient to establish a prima facie case of dissipation. This shifts the burden to spouse to show that the expenditures were appropriate.

Generally, one co-tenant who pays the mortgage, taxes, and other charges of jointly owned property is entitled to contribution from the other. In the absence of an ouster (or its equivalent) of the nonpaying spouse, a married, but separated, cotenant is, entitled to contribution for the expenses the paying spouse has paid. The circuit court did not abuse its discretion in ordering that the parties share the costs of any liens on the property and any necessary repairs pending the sale of the home, at which time the proceeds would be divided equally.

In the absence of value of the pensions or agreement by the parties, the court cannot properly set off one pension with another, and the division of the pension must, therefore, be pursuant to the *Bangs* "if, as, and when," method.

Circuit Court for Montgomery County
Case No. 124133-FL

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2390

September Term, 2017

_____

ZEYNAB ABDULLAHI

v.

GIANNI ZANINI

_____

Fader, C.J.,
Graeff,
Eyler, James. R.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed:  June 26, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Zeynab Abdullahi ("Wife"), appellant, challenges the September 4, 2017, Order of the Circuit Court for Montgomery County, and the November 29, 2017, Amended Order, which granted her an absolute divorce from Gianni Zanini ("Husband"), appellee, and divided marital assets. Wife presents multiple questions for this Court's review,[1] which we have revised as follows:

---

[1] Wife presents the following questions for our review:

I. The trial court abused its discretion it its monetary award and erred dividing marital property and retirement.

    a. The trial court erred in failing either to value the pensions or order them divided if, as and when.

    b. The trial court erred ordering the division of solely titled assets.

    c. The trial court erred including the children's trust accounts as wife's marital property.

    d. The trial court erred in permitting husband to opine as to the value of wife's interest in non-marital property.

    e. The trial court erred in determining the total amounts dissipated by husband and excluding wife's 5-1006 summaries.

    f. The trial court erred in effectively ordering wife to subsidize husband's living expenses.

II. The trial court abused its discretion in declining to award wife attorneys' fees.

    a. The trial court failed to use the correct legal standard in its attorneys' fees and analysis.

    b. The trial court erred by disregarding the delayed and prolonged proceedings caused by husband's perjured statements, discovery failures and postponement of the trial.

1. Did the circuit court abuse its discretion in granting the monetary award and dividing the marital property?
2. Did the circuit court abuse its discretion in declining to award wife attorneys' fees?
3. Did the circuit court err in failing to grant an absolute divorce on the grounds of adultery?

For the reasons set forth below, we shall affirm, in part, and vacate, in part, the judgment of the circuit court and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Background and Marriage

Wife was born in Somalia and moved to the United States in August 1977. She met Husband in 1986 while they were attending school in California.[2] They were married in a religious ceremony in California in 1986, and again in a civil ceremony in 1987 in Virginia. During the marriage, Wife and Husband had two children: Ebyan and Amanle, both of whom are now over 18 years old.

On January 5, 1987, Husband received a job with the World Bank, and he and Wife moved to the Washington, D.C. area. Wife initially worked for Bechtel Eastern Power, but she left her job to pursue a master's degree in energy systems at the University of Maryland.

---

III. The trial court erred in failing to grant an absolute divorce on the grounds of adultery.

[2] Wife testified that, at the time, she was pursuing her bachelor's degree in mechanical engineering, and Husband was pursuing a PhD in economics.

2

In 1995, Wife began working for the United States Nuclear Regulatory Commission. In 1998, the parties purchased a home in Maryland.

Husband's work at the World Bank required that he travel frequently. Husband testified that, when he was home, he would participate in running the household, take the children to their activities, and go to school meetings. Wife testified that when Ebyan was young, Husband was involved in taking her to various activities, and he cooked for the family. At some point, though, Husband stopped helping to maintain the home.

In December 2010, Husband retired from his job at the World Bank. He testified that he retired because his department at the World Bank was phased out. He received a separation package and was permitted to work as a consultant.

In early 2011, Husband approached Wife to discuss moving to Italy for a year. Part of his separation package with the World Bank "was tied" to him going to Italy. From summer 2011 to summer 2012, the parties and their children resided in Italy.[3]

Wife returned to work on August 1, 2012, and Husband took two additional trips in 2012. In 2013, Husband took motorcycle trips across the United States, and he took trips to Italy and Southeast Asia. Prior to Husband leaving for his trips in July 2013, Wife requested that they attend marriage counseling together. Husband attended two sessions, and he then returned to his travels. After Husband returned from his travels at the end of

---

[3] Wife testified that, because of the move, she took one year off of work without pay, and she lost benefits, including her contribution to her retirement accounts. During this year in Italy, Husband's income was the family's sole source of income.

October 2013, Wife found Viagra, Cialis, and other "performance enhancers" in Husband's luggage.

At the end of 2013, Wife was told by her doctors that she needed surgery. Husband was traveling at the beginning of 2014 when Wife was initially scheduled to have the surgery, so she postponed it until April 2014. Wife asserted that Husband was present after her surgery, but "he did not do anything" for her.

In June 2014, Wife requested Husband to attend marriage mediation. He refused. Husband resumed traveling in June 2014 and returned in September 2014.[4] When wife checked their laptop upon Husband's return, she found links to dating and escort sites, emails to "sex sites," and pictures.

## II.

### Commencement of Divorce Action and Subsequent Filings

In September 2014, Wife decided to pursue a divorce, and she presented Husband with a settlement agreement. On November 25, 2014, following unsuccessful settlement negotiations, Wife filed a Complaint For Absolute Divorce, Child Support & Related Relief, citing adultery as the ground for divorce, alleging dissipation of marital funds by Husband, and requesting a division of marital assets and attorneys' fees. On December 29, 2014, Husband filed his Answer and Counterclaim, in which he alleged desertion as

---

[4] Wife testified that, around this time, she received a bill showing that Husband had been tested for HIV. She also found medical records indicating that Husband had tested positive for a venereal disease in 2005. At that point, Wife had herself tested for fear that she had contracted an STD from Husband, but her tests came back negative on June 16, 2014. Wife testified that, during the course of her marriage, she never had sexual relations with anyone other than Husband.

4

grounds for divorce and admitted to committing adultery after June 14, 2014. In April 2015, Wife and Amanle left the marital home that was purchased in 1998 and moved to an apartment.

Each party amended their pleadings more than once. On June 3, 2015, Wife filed a Second Amended Complaint for Absolute Divorce, Alimony/Spousal Support, Custody, Child Support & Related Relief. Wife made requests for custody and child support, as well as requests for a monetary award, a portion of Husband's pension, and attorneys' fees.

On June 29, 2015, the circuit court held a merits trial regarding custody of the minor child, Amanle.[5] On August 18, 2015, the court issued a Custody Order, based on an agreement by the parties, awarding Wife primary physical custody and joint legal custody, with Wife having tie-breaking authority. On July 7, 2015, a magistrate conducted a hearing as to child support issues. Child support was awarded, but the record indicates that it ended when Amanle reached the age of 18 and completed high school.[6]

On November 14, 2016, Husband filed his Third Amended Counter-Complaint for Absolute Divorce and for Other Relief. Husband requested, among other things, that he "be granted an absolute divorce from [Wife] on the ground of a separation exceeding one year in duration," and that he "be awarded attorney's fees and legal costs incurred by him in connection with this matter."

---

[5] Ebyan was no longer a minor when divorce proceedings commenced.

[6] Amanle turned 18 in June 2016.

## III.

## Trial

Trial was scheduled to begin April 4, 2016, but counsel for Husband moved to strike his appearance and requested that the trial be postponed so that Husband could obtain new counsel. The court postponed the trial to June 28, 2016.

On June 28, 2016, the docket entries indicate that the court again postponed the trial because no judge was available. The court postponed trial to December 12, 2016.

On December 12, 2016, trial began. Although it was scheduled as a three-day trial, it continued for seven days, ending June 1, 2017.

The court bifurcated the issue of attorneys' fees and the merits, hearing argument on attorneys' fees first. Counsel for Wife argued that Husband was "both a cheat and a liar," and his lies forced wife to "expend significant amounts of time and attorney fees actually getting to the truth." He stated that any fees incurred after April 4, 2016, should be borne by Husband, who caused a postponement of the merits trial, noting that the judge who granted the continuance advised that Husband "would be chargeable for some of the additional expenses" incurred.

Addressing the merits of the suit, counsel for Wife stated, in pertinent part:

> As Your Honor knows, the World Bank pension cannot be divided. The World Bank doesn't honor state orders, but they will divide his pension by way of a spousal support order, and we will provide the Court with that form, and we would ask the Court to award [Wife] one-half of the World Bank pension. We're also asking the Court [to] transfer the marital home to [Wife], and the reason for that simply is because as a result of this litigation,

6

[Wife] has spent approximately $350,000 in counsel fees, the vast majority of which were all precipitated by [Husband's] behavior.[7]

Counsel also requested that the court reimburse Wife for all marital funds that Husband used "to pursue his girlfriends, to pursue his vacations, to pursue his motorcycles and various trips, et cetera," and he asked that the court transfer ownership of a Nissan Murano to Wife. Counsel requested that the court order that the contents of the former marital home be sold and the proceeds allocated between the parties and that the court award Wife attorneys' fees.

Husband's counsel stated that Wife's opening statement was more about the attorneys' fees than the facts of the case. He stated that, although the amount of attorneys' fees was unfortunate, "[w]hen you choose [to spend] money to have a PI to get adultery on someone who has admitted it, these are your choices."

On the merits, counsel noted that everyone agreed that there had been a one-year separation. He stated that there was no proof of adultery "inside of Maryland."

Counsel discussed the parties' marital and nonmarital property. He noted that the parties had received loans from Husband's family in the amount of $350,000, and Husband cashed in a third of his pension to pay off the mortgage on the marital home.

Regarding Wife's claims that Husband dissipated marital assets, counsel for Husband stated:

> You're seeing dissipation claims made on credit cards on loans. They're not even assets, and then what you're looking at when you're looking at these accountings, I mean you're looking at ATM charges, like $2. The rules about dissipation or the definition of it is the wasting of marital property or the

---

[7] Husband stated that his attorneys' fees amounted to $189,325.82.

7

devaluing of bank accounts to exclude them from division in a divorce. I don't think you're going to find any of that for either one of these parties.

Counsel stated that Husband's payments to other women did not exceed $10,000, and if the court thought it was dissipation, he would pay it back.

Counsel stated that the parties' main assets were Husband's World Bank pension, Wife's FERS and a TSP pension, the house, which was "debt free and is ready to be sold," and some vehicles. Counsel stated that it was Husband's position that "each of these parties is stuck with their own attorney's fees."

## A.

## Wife's Testimony

Wife testified that she and Husband had not cohabitated under the same roof since April 2015 and there was no hope of reconciliation. Wife's annual income from her job at the Nuclear Regulatory Commission was $153,702, and her official position was Senior Staff Engineer.[8] She wanted the court to award her the marital home, which she believed to be worth $750,000,[9] and transfer ownership of the Nissan Murano, titled in Husband's name, to her. Other than those two items, she requested that the court grant her a monetary award in "an amount equalizing the difference between the value of the assets in [her]

---

[8] She later testified that her income was $158,000 "gross, before taxes."

[9] When questioned why, in a prior Joint Statement of Parties Concerning Marital Property and Non-Marital Property, Wife had valued the marital home at $1,070,650, Wife stated that, by the time trial occurred, she realized the home needed maintenance work done to it. She testified that she believed the home needed at least $250,000 of work done, and she had contacted a contractor regarding what work was necessary for the home.

8

husband's name and the value of the assets in [her] name." She asked that the court award her "one half of the value of the World Bank pension."

Wife testified that Husband's parents had given them $237,000 to help them buy the marital home, and they had given them $100,000 on another occasion. When Husband retired, he "cashed out . . . approximately a third of his pension," amounting to approximately $800,000, which was used to pay off the mortgage on the marital home and other family debts.

Husband had two motorcycles that Wife contended constituted marital property because Husband purchased them with marital funds. Wife estimated that the value of these motorcycles was $8,565 and $7,215, and she used sources such as Craigslist and Kelly Blue Book to arrive at those values.

The parties owned several properties; Wife's properties were in Somalia and Husband's were in Italy. Wife stated, in the Joint Statement of Parties Concerning Marital and Non-Marital Property (the "Joint Statement"),[10] that the Somalia properties were worth $0. At trial, she explained that the properties had no value because Somalia was a "war-torn country." On cross-examination, however, Wife stated:

> The problem is not that it's worthless, it is, the problem is, this is Somalia where things are being blown up and my parents died without their property, and in my belief, maybe we will die before we get hold and go back there. So, that is one aspect of it.

---

[10] Maryland Rule 9-207 provides:

(a) **When Required.** When a monetary award or other relief pursuant to Code, Family Law Article, § 8-205 is an issue, the parties shall file a joint statement listing all property owned by one or both of them.

The second aspect of it is the fact that I am one, the way, my father did not leave or my mother or so, did not leave a will, so my share would go by the Islamic law, heritage law in which case I'll get one sixteenth of that price. . . .

Wife valued one of the Italy properties at $110,000, whereas Husband valued it at $80,000, and she valued the other Italy property at $375,200, whereas Husband valued it at $202,303. When asked how she arrived at the values for the Italy properties, Wife stated:

I looked at the properties' listing in the area as well as knowledge that when I was there, there were properties that were being sold there and the location as we say in (unintelligible) real estate, it's location, location, location. So combining all that thought plus a, what was a similar apartment listed there is what I used to come up with the value.

Wife also testified regarding two accounts, an Allianz Bank Investment Account, and an Allianz Bank Checking Account. Wife believed that these two accounts, titled in Husband's name, constituted marital property because she and counsel determined during discovery that Husband was wiring funds from a marital account to the Allianz account.

Wife had two types of Thrift Savings Plan ("TSP") accounts. She previously had withdrawn funds from her TSP to pay attorneys' fees. Most of the funds taken from the TSP were used to cover attorneys' fees, and some were used for other expenses, such as tuition for her son.[11]

---

[11] Wife stated that the IRS assessed penalties for the TSP withdrawal when she filed her 2015 taxes. Wife believed it was a 10 percent penalty because she was "not 59 and a half at the time of the withdrawal." She attempted to get a waiver of the penalty, but the IRS denied her request for waiver.

Wife next discussed her allegation that Husband dissipated $244,529.41 of marital funds. As discussed in more detail, *infra*, the circuit court admitted some, but not all, of Wife's proposed exhibits to show how she arrived at this figure.

**B.**

**Husband's Testimony**

Husband testified that, when he and Wife acquired the marital home, they paid a 20% down payment to purchase the home, and they received these funds from his parents.[12] Husband asserted that the funds received from his parents constituted a loan, not a gift, but he had not repaid his parents.

Husband continued to live in the marital home after Wife moved out in April 2015. He was paying the expenses on the home with no contribution from Wife. As of the time of trial, they were in arrears with respect to the payment of property taxes on the marital home for 2016. He had asked Wife to contribute to expenses, including property taxes, but she "did not reply to [his] request." Husband did not have the necessary funds, so he planned to sell one of the marital vehicles to pay the taxes.

Husband opined that the value of the marital home was $1,070,650. He believed that Wife's opinion that the marital home had depreciated in value by approximately $250,000 was inaccurate.

---

[12] Husband also referenced a second loan from his parents in the amount of $100,000, which he said he used "to pay off all our credit card and installment debt that we had accumulated in the previous years."

11

The parties owned two cars, a 2010 Nissan Murano and a 2013 Hyundai Elantra. Both vehicles were titled in Husband's name, and the parties agreed that the vehicles were marital property. Husband wanted to sell the Nissan Murano so that he could pay the marital home property tax arrearage. Husband and Wife initially agreed that the Nissan Murano was worth $17,000. At trial, however, Husband stated that he thought the Nissan's value had depreciated because the car had accrued more mileage since they filed the Joint Statement. Husband also owned several motorcycles.

Husband testified that he had two sources of income, his World Bank pension and the income he received from consulting for the World Bank. Upon retirement, he took one-third of his pension, approximately $800,000, as a lump sum payment, with two thirds of the pension remaining. He used this one-third payment to pay off the mortgages that the parties had on the marital home, to pay off their credit card debt, and "to put some money towards two college savings accounts" for their son.

The gross monthly amount of the pension Husband received was $11,102.66, but there were deductions each month for family medical insurance and life insurance. His net monthly pension amounted to $10,528.58. Husband also received income from consulting for the World Bank. In 2016, he earned approximately $35,000, and in the four months prior to trial, he earned $12,100. His consulting for the World Bank was "variable and decreasing" in frequency.

Husband also discussed various accounts listed on the Joint Statement. He believed that the Allianz Bank Investment Account was nonmarital because the source of funds for the account, which was solely in his name, was the proceeds of the sale of his father's

12

ancestral home. The Stocks account listed in the Joint Statement used to be titled in both his and his father's name, but after May 2014, his name was removed from the Stocks account.

With respect to Wife's adultery and dissipation claims, Husband estimated that he spent $6,746 traveling with other women. He spent $1,555 on wire transfers to other women, and $775.39 in dating website fees. He agreed that a portion of the $1,555, i.e., transfers from Western Union, constituted dissipation, but he alleged that transfers from his Allianz account were transfers of nonmarital funds. Husband admitted that he first had sexual relations with other women beginning in October 2012.

## C.

### Marc Pushkin Testimony

Marc Pushkin, an expert in the area of pension retirement assets, testified that he was asked to look at the parties' pensions and the social security benefits that they had earned and could expect to receive in the future. He could not precisely ascertain the social security benefits that Wife would receive because "she may have continued employment, she may have more earnings," and "until the person actually retires, [one cannot] know what [her] final work history will be."

Mr. Pushkin explained that Husband would not receive social security benefits attributable to his work at the World Bank. Husband could, however, receive social security benefits as a spouse "if he met the requirements for spousal benefits." Those requirements, which Husband satisfied, included a marriage of 10 years, being age 62 years or older, and being entitled to a benefit less than his ex-spouse's benefit.

13

Mr. Pushkin testified that he could not specify precisely the benefits Husband would receive as a result of Wife's entitlement, but it generally would be 50% of what her benefit would be at her normal retirement age, although it would be adjusted if Husband took it earlier than Wife's normal retirement age.[13]  Unlike with a pension, Wife would be entitled to the full measure of her social security benefits, despite Husband's ability to receive 50 percent of the amount of her benefits.  That is, Wife's share would not be diminished by any benefit that Husband would receive.  And Husband's election to receive Wife's social security benefits was independent of Wife's election to receive her own benefits.  Mr. Pushkin also testified that various provisions that might reduce the social security benefits that Husband would receive, such as a "government pension offset" and "windfall elimination provisions," would not apply here.[14]

Mr. Pushkin next discussed the World Bank's policy on dividing pensions.  He stated:

---

[13] Mr. Pushkin stated that the earliest Wife would become entitled to social security benefits was at age 62.  Wife turns 62 in August 2019.

[14] Mr. Pushkin explained that, if a person receives a "pension from a federal, state[,] or local government based on work for which [he/she] did not pay social security taxes, [his/her] social security spouse or widow's benefits can be reduced under certain circumstances."  The government pension offset would not apply here because it does not apply to a foreign pension, such as Husband's World Bank pension.  The windfall elimination provision provides that pension benefits can reduce social security retirement benefits if the employer does not withhold social security taxes from the person's salary, but the social security benefit that Husband would get would be a spousal benefit, not based on his own record of work, and therefore, it was inapplicable to this situation.

14

> [T]he World Bank is not subject to the normal rules of QDROs[15] because it's not under the – the normal QDRO rules under U.S. law do not apply to the World Bank so the World Bank has their own set of rules and they have what's called a spousal support order. So you have to follow the spousal support order if you want to effectuate what we would refer to as a QDRO.

The World Bank required the division of retirement benefits be granted as spousal support.

## D.

### Douglas White Testimony

Douglas White, an expert in Certified Public Accounting, testified that he was retained to help Wife prepare her 2015 tax returns and to compute her 2015 federal and Maryland state tax liabilities resulting from her withdrawal of $200,000 from her TSP retirement account in 2015. Of the $200,000 that was withdrawn from her TSP, $186,686 was taxable, and the total tax and penalty due to her withdrawal from the TSP alone was $97,797.

As of the date of trial, Wife still owed taxes for the 2015 tax year. She was on an installment plan with the IRS, paying $655 per month on the remaining balance owed.

## E.

### Paul Reinstein Testimony

Paul Reinstein, a family law attorney, testified regarding World Bank pension orders. He stated that the World Bank does honor pension orders, but he explained:

---

[15] As this Court has explained: "A qualified domestic relations order, or QDRO, is a subset of domestic relations orders that recognizes the right of an alternate payee to receive all or a portion of the benefits payable with respect to a pension plan's participant under the respective pension plan." *Robinette v. Hunsecker*, 212 Md. App. 76, 81 n.2 (2013), *aff'd*, 439 Md. 243 (2014).

World Bank is non-ERISA. It is not subject to the federal ERISA legislation but they have historically honored domestic relations orders. Not Q[D]ROs but domestic relations orders as long as they designate the payment as spousal support.

That's just a unique feature of a World Bank pension plan in terms of what they will recognize. As long as it is designated as spousal support or alimony they will recognize the order. That's just unique to the World Bank.

Mr. Reinstein testified that the World Bank would honor "either a percentage designation or a dollar amount designation."

With respect to the $425,000 that Wife had accrued in attorneys' fees, Mr. Reinstein opined that this amount was reasonable given the litigation regarding World Bank pension issues, as well as custody and child support. Additionally, the fees and time spent pursuing a deposition of Husband's expert witness, Timothy Voit, who in the end did not testify, were appropriate. And, due to Husband's equivocation as to when his acts of adultery first began, it was appropriate to expend time and fees to determine the truth regarding the beginning of his adulterous acts.

### F.

### Hadrian Hatfield Testimony

Hadrian Hatfield, an expert in family law, testified on behalf of Husband. Mr. Hatfield explained that the World Bank pension scheme for pre-1998 employees does not provide survivor benefits to an ex-spouse.

The World Bank will "not accept an order that purports to divide a pension." Mr. Hatfield explained that, in Maryland, the court can either reduce a pension to present value and account for that amount in a monetary award or a set off of assets or "award an if, as,

16

and when type of payment from the pension or even a division of pension assets."[16]  He

stated that an "if, as and when" division of the pension assets was not available with a

World Bank pension, explaining that, similar to a pension from a foreign government, the

court did not "have the power to tell those folks what to do with their pension benefits."

Mr. Hatfield then opined that there were four options for the World Bank pension.

First, the court could "issue your standard type of pension division order," which was not

acceptable because the World Bank would refuse to honor it, and the parties would be back

in court.

Second, the court could issue a monetary award, although there would have to "be

enough marital property available to do that," and the court would have to value the

different properties.  In that regard, Mr. Hatfield stated:

> [W]e would typically have an expert look at the World Bank pension
> benefits, look at the mortality tables, and in circumstances with
> international pensions, you have to look at the currency fluctuation risk
> and render an opinion as to the present value of those benefits.
>
> *       *       *
>
> For a monetary award, it's my opinion that a Court would have to have a
> present value for the pension.  And I think it's very difficult to issue a
> monetary award and be sustained on appeal if you haven't valued it.

---

[16] As explained, *infra*, one way a court can divide a pension is to grant one spouse
a percentage of the other spouse's pension "if, as and when" the pension is received.
*See Bangs v. Bangs*, 59 Md. App. 350, 368, (1984).

The third option, in Mr. Hatfield's opinion, was a set off, where the court could give a similarly valued property to Wife without any division of the World Bank pension. He stated:

> Now, the issues that you run into are of course still valuation – you want to make sure that the setoff is as close as possible to the true value.[17]  You've got to look at tax consequences.  If you're setting off against pension interests, presumably you want the interest to be as close as possible to the same, so is it in pay status or not are considerations that the Court would have.  And in my opinion, if it's possible, that's probably the cleanest way to do things.

And finally, the fourth option was to order spousal support as a substitute for the inability to divide the pension.

Mr. Hatfield thought that setoff was the best option, followed by a monetary award, an alimony order, and an order purporting to divide a pension.  Mr. Hatfield agreed that, if the court ordered Husband in a spousal support order to pay Wife 50 percent of his pension on a monthly basis as he receives it, that would be close to an "as, if, and when" award. He stated, however, that there would be two issues with this option:

> [T]he continuing modification ability of it and determination of alimony is different from the division of assets.  And then there's the whole control issue . . . .

*     *     *

> . . . [Wife] would not have control over the asset in the same fashion. That is, it wouldn't be her ownership interest as if it were a non-World Bank or for the jurisdiction pension that is if it were a U.S. based pension, she would become the owner of her interest.

---

[17] Mr. Hatfield acknowledged that, except for limited exceptions, Maryland law does not permit a court to transfer ownership of assets, which could lead to difficulties in doing an offset.

## G.

## Closing Arguments

In closing, Wife's counsel requested that Wife be awarded a divorce based on the grounds of adultery, and that the court sign a spousal support order and award Wife 50% of Husband's World Bank pension, including her share of any cost of living adjustments ("COLAs"). Additionally, Wife asked that the court award her the marital home and the Nissan Murano, that the court "make a monetary award based on the ownership of the interest set forth in the 9-207 [Joint] [S]tatement," and that the court restore all dissipated funds, which she asserted was $77,029, "by adding them to [Husband's] column of marital assets."

Counsel also requested that the court award Wife attorneys' fees and expert witness fees, stating that Husband made the case "more difficult and time consuming than it needed to be," and "[a]s a result, it cost far more than it should have." Counsel cited to difficulties, including Husband's initial refusal to pay pendente lite child support, which led to a hearing ordering him to pay, Husband's initial fight over custody, until he reached an agreement with Wife, and Husband's refusal to provide Mr. Voit's expert report, though Husband ultimately did not call him as a witness.

Counsel for Husband requested that the court award Husband a divorce based on the no-fault ground of a one-year separation. He asserted that Husband's initial lie about a discreet period of time prior to 2014 when he was committing adultery did not justify Wife's exorbitant legal fees. He argued that Wife had failed to prove her initial claim that Husband dissipated over $200,000 of marital funds.

19

As to Husband's World Bank pension, Husband's position was that both his and Wife's pensions "should just be left alone," with each party keeping their respective pensions. Counsel noted that "the pension was never valued," and as a result, many of the "avenues that th[e] Court would have to resolve this issue of a World Bank pension" were unavailable. With respect to the marital home and the parties' personal property, counsel asserted that they should be sold and the proceeds divided between the parties.

Counsel argued that Wife was not entitled to an award of attorneys' fees. Counsel stated that "these people should go their separate ways with what they have," and any monetary award granted should be "small."

## IV.

## Circuit Court Ruling and Amended Order

On September 13, 2017, the circuit court issued a Judgment of Absolute Divorce pursuant to one-year separation. The court ordered that Husband transfer title and ownership of the Nissan Murano to Wife for the fair market value of $17,000, and the marital home be sold. It awarded Wife a monetary award of $62,313.45 ("$22,000.00 for [Husband's] dissipation of marital funds and $40,313.45 for [Wife's] portion of the motorcycles that [were] marital property"), and it awarded Wife "spousal support to represent [Wife's] distributive share of [Husband's] World Bank pension in the amount of $2,000 per month with the cost of living increase to be adjusted pro rata in addition to the monthly amount."

On September 25, 2017, Wife filed a motion to alter or amend the court's judgment. She asserted:

20

The Order and Judgment 1) contained certain mathematical and other errors, which when corrected would result in a different monetary award to [Wife]; 2) which provided for more than one monetary award, may be rectified by combining the awards set forth in the Order and Judgment into one award; 3) provided for an inequitable distribution of retirement benefits; 4) ordered the former marital home sold, inappropriately ordered [Wife] to pay a portion of [Husband's] living expenses in the home which he occupies; 5) inaccurately accounted for the values of the parties' non-marital property; 6) failed to include all of the funds dissipated by [Husband] in its monetary awards; 7) declined to grant [Wife] attorney's fees despite evidence of substantial fees incurred due to [Husband's] untruths, misrepresentations and other actions throughout this litigation; and 8) failed to address [Wife's] request for expert witness fees and costs, including expenses necessitated by [Husband's] untimely production of an "expert report."

Wife requested: (1) a monetary award of at least $98,653; (2) Husband's World Bank pension be equally divided; (3) Wife's retirement benefits be divided on an "if, as, and when" basis; (4) Husband be responsible for taxes and costs of marital home until sold; and (5) Husband be ordered to pay attorneys' and expert fees.

On September 25, 2017, Husband also filed a motion to alter or amend the court's judgment. He raised several errors, including: (1) the court included in Wife's monetary award $40,313.45 for the value of Husband's motorcycle collection, but that was 100% of the value, and half the value was $20,156.73; (2) the court ordered that Husband transfer title of the Nissan Murano to Wife, but the court lacked authority to transfer title to that asset; (3) the court erred in determining that Husband's Allianz account was marital; and (4) the court erred in failing to award Husband attorneys' fees.

On November 29, 2017, the circuit court issued an Amended Order. The amended order stated that "any and all orders set forth in this Court's Opinion . . . and Judgment of Absolute Divorce . . . not specifically revised in th[e] Amended Order . . . remain in effect."

21

It granted, in part, and denied, in part, both Wife's and Husband's motions to alter or amend, and provided, in pertinent part:

> ORDERED, that [Wife's] monetary award shall be revised to reflect that [Wife's] portion of motorcycles that are marital property is $20,156.73 [as opposed to $40,313.45]; and it is further,
>
> ORDERED, that [Husband] shall retain title and ownership of the 2010 Nissan Murano, and that its full fair market value of $17,000 shall be added to [Wife's] monetary award, in order to secure replacement transportation for [Wife]; and it is further,
>
> ORDERED, that [Wife] shall be awarded the monetary award of $59,156.73 from [Husband] ($22,000.00 for [Husband's] dissipation of marital funds, $20,156.73 for [Wife's] portion of motorcycles that are marital property, and $17,000.00 fair market value of 2010 Nissan Murano to secure replacement transportation), and this amount shall be reduced to judgment in favor of [Wife], if it is not paid to [Wife] within 90 days of the entry of this Order[.]

This appeal followed.[18]

## DISCUSSION

Wife raises several contentions of error. Before addressing these contentions, however, we consider Husband's motion to dismiss.

## I.

### Motion to Dismiss

Husband contends that Wife's appeal should be dismissed because, after she noted her appeal to this Court, she accepted title to the Nissan Murano and a $22,000 payment

---

[18] Husband also filed a motion for in banc review, but it was dismissed because Husband failed to file the required memoranda.

toward the monetary award, and "her acceptance of, and thus acquiescence of, the monetary award" renders her appeal moot. As explained below, we disagree.

To be sure, the general rule is that a party may not acquiesce in a judgment and accept its benefits while attacking the judgment on appeal. *See Dietz v. Dietz*, 351 Md. 683, 689 (1998); *Turner v. Turner*, 147 Md. App. 350 (2002)*; Chimes v. Michael*, 131 Md. App. 271, *cert. denied*, 359 Md. 334 (2000). In *Chimes*, the case upon which Husband relies, we stated:

> It is well settled in Maryland, and the law generally is to the effect, that, if a party, knowing the facts, voluntarily accepts the benefits accruing to him under a judgment, order, or decree, such acceptance operates as a waiver of any errors in the judgment, order, or decree and estops that party from maintaining an appeal therefrom.

*Id.* at 280 (quoting *Fry v. Coyote Portfolio, LLC,* 128 Md. App. 607, 616 (1999)). The Court of Appeals similarly has stated that "'[t]he right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal.'" *Dietz*, 351 Md. at 689 (quoting *Rocks v. Brosius*, 241 Md. 612, 630 (1966)).

There are, however, exceptions to this general rule. In *Lewis v. Lewis*, 219 Md. 313, 317 (1959), the Court of Appeals stated: "[I]f applicable at all in a divorce case, the [acquiescence doctrine] cannot be raised where the benefits accruing to the wife, by reason of the award, provide necessary support until the final adjudication of the case." And in *Dietz*, the Court noted that an exception to the general rule exists where the judgment was "'for less than the amount or short of the right claimed.'" *Dietz*, 351 Md. at 688 (quoting *Baer v. Robbins*, 117 Md. 213, 343 (1912)).

23

In *Dietz*, 351 Md. at 696–97, the Court held that dismissal was improper, even though Mrs. Dietz deposited a check for a portion of the marital award. The Court stated that, because Mr. Dietz had not filed a cross-appeal objecting to the monetary award, and Mrs. Dietz was seeking an increase in the monetary award, there was nothing inconsistent about her acceptance of the award that was made and her appeal seeking an increase in that award. *Id.* Accordingly, there was no acquiescence in the judgment. *Id.* at 697. *Accord Smith v. Smith*, 702 S.W.2d. 505, 507 (Mo. Ct. App. 1985) (motion to dismiss wife's appeal denied because she was paid only a fraction of the judgment awarded, husband did not appeal, and the issue on appeal was whether awards to wife would be increased).

The exception discussed in *Dietz* weighs against Husband's motion to dismiss Wife's appeal. Here, as in *Dietz*, Husband did not pursue a challenge to the monetary award, and Wife contends on appeal that she is entitled to a larger monetary award, which is not inconsistent with her acceptance of a portion of the award.[19]

In this case, however, there is an even stronger reason not to dismiss the appeal. In Wife's opposition to the motion to dismiss, she attached a document signed by counsel for Husband stating that Husband would not "raise the defense of acquiescence or the holding in *Chimes v. Michaels* for any reason in [Wife's] appeal."[20] Husband has not disputed the

---

[19] In *Chimes*, 131 Md. App. 271, 279 (2000), *cert. denied*, 359 Md. 334 (2000), by contrast, appellant accepted the entire monetary award and filed a statement of satisfaction with the court.

[20] To be sure, this agreement was based on a different action by Wife, but Husband agreed not to raise the defense of acquiescence "for any reason."

authenticity of this document. Under these circumstances, where Husband told Wife that he would not raise the acquiescence rule, Husband has waived any right to argue that the acquiescence rule requires dismissal of this appeal. *See Skokos v. Skokos*, 968 S.W.2d 26, 30 (Ark. 1998) (appellee may "'waive' his right to declare a waiver of appeal on the part of an appellant," by promising that "acceptance of payment under the judgment will not prejudice her right to appeal"). Accordingly, we shall deny Husband's motion to dismiss the appeal.

## II.

## Property Disposition

Turning to Wife's contentions on the merits, Wife's first argument is that the circuit court "abused its discretion in its monetary award and erred in dividing marital property and retirement" benefits. She raises multiple grounds of error in this regard. Before addressing each of these specific contentions, we set forth the general law regarding monetary awards.

## A.

## Monetary Awards

The three-step process for determining whether to grant a monetary award is well settled. First, for each disputed item of property, the judge must determine whether it is marital or non-marital. *Flanagan v. Flanagan*, 181 Md. App. 492, 519 (2008); Md. Code (2012 Repl. Vol.), § 8-203 of the Family Law Article ("FL").

Marital property refers to "property, however titled, acquired by 1 or both parties during the marriage." FL § 8-201(e)(1). The statute further provides:

(2) "Marital property" includes any interest in real property held by the parties as tenants by the entirety unless the real property is excluded by valid agreement.

(3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:

(i) acquired before the marriage;

(ii) acquired by inheritance or gift from a third party;

(iii) excluded by valid agreement; or

(iv) directly traceable to any of these sources.

FL § 8-201(e).

Second, the court must determine the value of all marital property. *Flanagan*, 181 Md. App. at 519; FL § 8-204. Third, the court "must decide if the division of marital property according to title would be unfair," and if so, it "may make a monetary award to rectify any inequity 'created by the way in which property acquired during marriage happened to be titled.'" *Flanagan*, 181 Md. App. at 519–20 (quoting *Doser v. Doser*, 106 Md. App. 329, 349 (1995)). *See* FL § 8-205(a).

In ordering a monetary award, FL § 8-205(b) sets forth the factors that the court must consider:

(1) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(2) the value of all property interests of each party;

(3) the economic circumstances of each party at the time the award is to be made;

(4) the circumstances that contributed to the estrangement of the parties;

26

(5) the duration of the marriage;

(6) the age of each party;

(7) the physical and mental condition of each party;

(8) how and when specific marital property or interest in property described in subsection (a)(2) of this section, was acquired, including the effort expended by each party in accumulating the marital property or the interest in property described in subsection (a)(2) of this section, or both;

(9) the contribution by either party of property described in § 8-201(e)(3) of this subtitle to the acquisition of real property held by the parties as tenants by the entirety;

(10) any award of alimony and any award or other provision that the court has made with respect to family use personal property or the family home; and

(11) any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award or transfer of an interest in property described in subsection (a)(2) of this section, or both.

"The clear intent of [the monetary award] is to counterbalance any unfairness that may result from the actual distribution of property acquired during the marriage, strictly in accordance with its title." *Brewer v. Brewer*, 156 Md. App. 77, 110 (quoting *Ward v. Ward*, 52 Md. App. 336, 339 (1982)), *cert. denied*, 381 Md. 677 (2004). *Accord Long v. Long*, 129 Md. App. 554, 578 (2000). "[T]he decision whether to grant a monetary award is generally within the sound discretion of the trial court." *Collins v. Collins*, 144 Md. App. 395, 409 (2002) (quoting *Alston v. Alston,* 331 Md. 496, 504 (1993)).

Here, after addressing the factors above, including the parties' considerable property interests, both marital and non-marital, the court stated as follows:

27

[A] monetary award shall be made in favor of [Wife] in the amount of $22,000 due to [Husband's] dissipation of $44,000 of marital funds and this amount shall be reduced to judgment against [Husband] and in favor of [Wife]. Another monetary award shall be made in favor of [Wife] and against [Husband] in the amount of $40,313.45 for . . . half the value of the motorcycles and trailers that shall remain with [Husband]. This sum, too, shall be reduced to judgment against [Husband] and in favor of [Wife]. [Wife] also had the need to withdraw about $200,000.00 from her TSP retirement fund to pay for taxes and this litigation. As reflected in Appendix 1, following the equalization of accounts, [Wife] retains marital assets totaling $505,084.60, which is $373,651.18 more than [Husband]. However, the non-marital assets retained by each party reflect that [Wife] retains non-marital assets in the amount of $103,350.00 and [Husband] retains non-marital assets totaling $282,453.00, which is a difference in assets of $179,103.00. In consideration of these amounts, the Court finds a total monetary award of $62,313.45 in favor of [Wife] shall be awarded and reduced to judgment against [Husband]. The Court finds that the [Wife] shall be granted a spousal support in the amount of $2,000 per month with the cost of living increase to be adjusted pro rata in addition to the monthly amount. This award represented [Wife's] distributive share of [Husband's] World Bank pension, discussed above.[21]

With this background in mind, we address Wife's specific contentions.

**B.**

**Errors in Calculating Assets**

As indicated, the court looked to the total assets of each party, marital and nonmarital, in determining what would be an equitable monetary award. Wife contends that the court's assessment of some of these assets was erroneous. As explained below, we

---

[21] As indicated, *infra*, the court subsequently issued an Amended Order revising the monetary award to be $59,156.73, which included "$22,000 for [Husband's] dissipation of marital funds, $20,156.73 for [Wife's] portion of motorcycles that are marital property, and $17,000.00 fair market value of 2010 Nissan Murano to secure replacement transportation[.]"

28

agree, and therefore, we shall vacate the monetary award and remand for further proceedings consistent with this opinion.

## 1.

## Property Titled in One Party's Name

Wife contends that the circuit court erred by dividing the value of property titled in one party's name and ordering the transfer of these solely titled assets. She asserts that the court did not have the authority to transfer ownership of the Allianz accounts and the Nissan, which were titled in Husband's name, and the court instead should have accounted for the values of these items in a monetary award.

FL § 8-202(a)(3) states: "Except as provided in § 8-205 of this subtitle, the court may not transfer the ownership of personal or real property from [one] party to the other." *Accord Brewer*, 156 Md. App. at 111. FL § 8-205(a) provides:

(1) Subject to the provisions of subsection (b) of this section, after the court determines which property is marital property, and the value of the marital property, the court may transfer ownership of an interest in property described in paragraph (2) of this subsection, grant a monetary award, or both, as an adjustment of the equities and rights of the parties concerning marital property, whether or not alimony is awarded.

(2) The court may transfer ownership of an interest in:

(i) a pension, retirement, profit sharing, or deferred compensation plan, from one party to either or both parties;

(ii) subject to the consent of any lienholders, family use personal property, from one or both parties to either or both parties;[22] and

---

[22] Maryland Code (2012), § 8-201(d)(1) of the Family Law Article ("FL") defines "family use personal property" as tangible personal property "(i) acquired during the marriage; (ii) owned by 1 or both of the parties; and (iii) used primarily for family

29

(iii) subject to the terms of any lien, real property jointly owned by the parties and used as the principal residence of the parties when they lived together[.]

Here, with respect to the Nissan, Wife testified that it was titled in Husband's name, but it was the car she used to buy groceries and drive her son. Thus, the Nissan potentially could qualify as family use personal property, giving the court authority to transfer title to it pursuant to FL § 8-205(a).

The parties' son, however, had turned 18 by the time of the court's September 17, 2017, order. Neither party addresses whether this fact, that Amanle was not a minor at the time of the order, is relevant to the issue whether the Nissan constituted family use personal property. We need not decide the issue in this case because, although the court's initial ruling ordered the transfer of title of the Nissan, in the Amended Order, the court ordered that "Husband shall retain title and ownership of" the Nissan, and the $17,000 fair market value would be added to Wife's monetary award. Thus, any potential error was corrected by the Amended Order.

The record reflects, however, that by the time the Amended Order was issued, the title already had been transferred. At oral argument in this Court, counsel for Wife conceded, appropriately, that because title had already been transferred to Wife, Wife was

purposes." Family use personal property includes motor vehicles, and it "does not include property: (i) acquired by inheritance or gift from a third party; or (ii) excluded by valid agreement." FL § 8-201(d)(2)&(3).

30

not also entitled to a monetary award for the $17,000 value of the vehicle. This can be sorted out on remand.

With respect to the Allianz bank accounts, these clearly do not fall into the category of property for which the court may transfer ownership. Husband contends that the court did not order the division of these accounts. The record shows otherwise.

The court found that the Allianz bank accounts were marital property, with a value of $86,075.66 and $23,228.33, and they "shall be divided equally between the parties." The court then allocated half of each account to Wife's purported assets, even though the court did not have the authority to transfer this property, which was titled in Husband's name. In assessing the value of bank accounts, the court may not divide accounts listed in one party's name because that constitutes an improper transfer of ownership.

The court, in accordance with its stated intent to divide these accounts "equally between the parties," should have counted the entirety of the accounts as Husband's assets and included Wife's share, approximately $55,000, in the monetary award. The court can make this correction on remand.[23]

_____

[23] We have addressed only the Allianz accounts because those were the accounts addressed in the brief. We note, however, that the court used the same analysis for other checking and savings accounts that were in one party's name, and the court can revisit this, as well, on remand.

31

**2.**

**College Accounts**

Wife next contends that the circuit court "erred by determining [that] the Maryland College Investment Plan FBO Aman Zanini and the Maryland Prepaid College Trust FBO Aman Zanini were marital property titled in Wife's name and Wife's property for purposes of a monetary award." Husband contends that the circuit court "did not err in finding the college savings accounts to be [Wife's] property, as [Wife] is the account holder of said accounts."

The court found that the two college accounts, with values of $39,399.31 and $39,960, were marital property. The court stated that, because these accounts were "for the benefit of Aman with [Wife] as trustee, the amount shall remain with [Wife]."

In assessing whether the court's analysis was proper, we note that the parties agreed in the Joint Statement that the two college accounts were marital property. Because the amounts in the account were acquired during the marriage, we agree that the accounts were marital property.[24]

We disagree, however, with the circuit court's determination that, because the accounts, which were for the benefit of the parties' son, were titled in Wife's name, it should be counted as Wife's property. The 529 accounts here were referred to as college accounts to be used for the benefit of the parties' son. *See* 26 U.S.C. § 529 (2018)

_____

[24] The parties indicated that part of the one-third of Husband's World Bank pension that Husband took when he retired was used to fund these accounts.

(Qualified tuition programs). There was no suggestion or evidence that Wife intended to use the funds for anything other than that purpose. Under these circumstances, it was not appropriate to consider these accounts as Wife's separate assets for the purpose of determining an equitable monetary award.

In *D.G. v. S.G.*, 82 N.E.3d 342, 353 (Ind. Ct. App. 2017), *trans. denied*, 96 N.E.3d 576 (2018), the Court of Appeals of Indiana held that, where there was no evidence that the funds in 529 college accounts would not be used for college, the court should not have treated the accounts as mother's property in its division of the marital assets. The court held that, on remand, the court should set aside the 529 accounts before valuing the distribution of marital assets. *Id.*

We agree with that analysis. Where there is nothing to suggest that the custodian of 529 college accounts, which are held for the benefit of a child's college education, will use the funds for another purpose, it is improper to consider the funds as assets of that parent in determining a monetary award. On remand, the court should not consider the college accounts, which at the time of trial were valued at approximately $80,000, as Wife's assets when determining the appropriate monetary award.

### 3.

### Property in Somalia

Wife argues that the circuit court "erred in permitting husband to opine as to the value of Wife's interest in non-marital property," namely, a farm and homes "left to Wife and her ten siblings in war-torn Somalia." Wife testified that the property had a value of zero because it was uncertain whether anyone would receive anything, given the

uncertainty in Somalia and that her share was one-sixteenth of the property. Husband, by contrast, claimed in the Joint Statement that the value of the homes in Somalia was $77,200 and the farm was $20,000. Wife contends that the court erred in relying on these unsupported values.

Husband contends that the circuit court "did not err by accepting [his] opinion as to the value of [Wife's] interest in non-marital property, when [Wife's] value was unreasonable and contradicted by her own testimony." In any event, Husband states that it was harmless error for the court to accept his value of the property because "it did not affect the ultimate monetary award."

A party seeking a monetary award has the burden of establishing the value of the marital property and the value of nonmarital property. *Blake v. Blake*, 81 Md. App. 712, 720 (1990). *Accord Murray v. Murray*, 190 Md. App. 553, 570 (2010). "Value," under Maryland law, "means fair market value," i.e., "'the amount at which property could change hands between a willing buyer and a willing seller.'" *Rosenberg*, 64 Md. App. 487, 525 (quoting *Black's Law Dictionary* 537 (rev. 5th ed.)), *cert. denied*, 305 Md. 107 (1985).

Valuation is a question of fact subject to the clearly erroneous standard of review. *Blake*, 81 Md. App. at 720. "When the [circuit] court's findings are supported by substantial evidence, the findings are not clearly erroneous." *Innerbichler v. Innerbichler*, 132 Md. App. 207, 230, *cert. denied*, 361 Md. 232 (2000).

Here, as indicated, Wife testified that the properties had been owned by her parents, but they left Somalia when the civil war began, and they subsequently died without a will. She testified that, because Somalia was a "war-torn country," there was "no value selling

34

anything" and the selling value was "zero." On cross-examination, she further stated that she had a lot of brothers and sisters, and "under Muslim law," her share of the property was "one sixteenth of the value."

"[A]n owner of property is presumed to be qualified to testify as to his [or her] opinion of the value of property he [or she] owns," *Colonial Pipeline Co. v. Gimbel*, 54 Md. App. 32, 44, *cert. denied*, 296 Md. 110 (1983). Once Wife testified with respect to her opinion regarding the value of the properties, the burden shifted to Husband to contradict this value. *See Brown v. Brown*, 195 Md. App. 72, 120 (2010).

Husband, however, did not testify regarding the value of the Somalia properties. He merely listed a value for the properties on the Joint Statement. He gave no basis for the reasoning behind these values, not even whether he had ever seen them or had any idea how property would be valued in Somalia.[25] Husband's bald assertion of value, given solely in the Joint Statement, did not meet his burden to contradict the value provided by Wife.

Where the parties disagreed on the value of the property, and Wife presented evidence that the property had no value, the circuit court erred in accepting Husband's bald assertion of value provided in the Joint Statement, which was unsupported by any reasoning regarding how he arrived at that result. *See In re Dany G.*, 223 Md. App. 707, 719 (2015) ("Findings of fact that are clearly erroneous are marked by a lack of competent

---

[25] When counsel for Husband cross-examined Wife regarding her valuation of Husband's properties in Italy, he established that she was not the owner of the properties, and she was not a property appraiser in Italy.

35

and material evidence in the record to support the decision."); *Thompson v. Thompson*, 811 N.E.2d 888, 917 (Ind. Ct. App. 2004) (trial court abused its discretion in accepting Wife's value of Husband's 401K account where there was no evidence to support that value), *trans. denied*, 831 N.E.2d 740 (Ind. 2005). On remand, in the absence of further evidence, the circuit court should not include a value of $97,200 for the Somalia property as assets of Wife in determining a proper marital award.

## 4.

### Dissipation

As indicated, to determine whether to grant a monetary award, and if so, the amount, the court must determine the value of the marital property. "Generally, 'property disposed of before trial cannot be marital property.'" *Omayaka v. Omayaka*, 417 Md. 643, 653 (2011) (quoting *Turner*, 147 Md. App. at 409). An exception exists when the court "'finds that property was intentionally dissipated in order to avoid inclusion of the property towards consideration of a monetary award.'" *Id.* (quoting *Sharp v. Sharp*, 58 Md. App. 386, 401 (1984)). *See also Sharp*, 58 Md. App. at 401 ("Dissipation may be found where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage[.]").

When dissipation is found, the court may "include, as extant marital property, marital property that was transferred, spent, or disposed of in some fashion by one of the spouses." *Heger v. Heger*, 184 Md. App. 83, 97 (2009). The Court of Appeals has explained the burden of proof regarding a claim of dissipation of assets, as follows:

> "The burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation. That party retains throughout the burden of persuading the court that funds have been dissipated, but after that party establishes a prima facie case that monies have been dissipated, i.e. expended for the principal purpose of reducing the funds available for equitable distribution, the burden shifts to the party who spent the money to produce evidence sufficient to show that the expenditures were appropriate."

*Omayaka*, 417 Md. at 657 (quoting *Jeffcoat v. Jeffcoat*, 102 Md. App. 301, 311 (1994)) (internal citations omitted).

Here, the court found that Husband dissipated funds in the amount of $44,000. In that regard, the court stated:

> [Wife] asserts that [Husband] dissipated $244,529.41 of marital funds. During trial, the parties agreed that the amount of dissipation by [Husband] was not $244,529.41, as [Wife] initially claimed. Instead, they agreed that the baseline amount of dissipation was $79,029.00 [sic]. [Wife] testified during trial that the travel funds [Husband] used to commit adultery that were dissipated from marital funds totals approximately $40,791.86. She also testified that [Husband] wired $2,475.80 to a woman and this amount should also be included. Plaintiff's Exhibit #22. The Court finds that the amount of funds dissipated by [Husband] to be $44,000.00.[26] This amount shall be divided equally between the parties. See Appendix 1.

Wife contends that the court erred in determining that the amount of funds dissipated was $44,000, asserting that the court improperly excluded evidence of Husband's dissipation of marital property, "which would have formed the basis of a finding of dissipation by Husband of $116,547.82."[27] She contends that the court improperly ruled

---

[26] We note that the numbers cited by the court do not add up to $44,000; the court may have "rounded up" to an even number.

[27] Wife details the expenditures amounting to $116,547.82, as follows:

that she had the burden to prove how Husband used the funds, and the "exclusion of $39,518.82 in withdrawals from Husband's sole account without explanation and additional travel of $22,027.40, should be included in marital property dissipated by Husband and added back to the marital pot."

Husband argues that the circuit court "did not err in calculating the total amounts dissipated by [him]." He asserts that Wife requested in closing argument that she be awarded $77,029 for assets dissipated by Husband, but Husband's evidence showed that the amount dissipated was approximately $9,077.[28] Husband also argues that the "court correctly excluded [Wife's] summaries of dissipation" because "they did not comply with Md. Rule 5-1006."

Here, because Wife's contention on appeal involves the court's exclusion of evidence of dissipation, we are concerned with the burden of production. Thus, the question is whether Wife established a prima facie case that the monies were dissipated,

---

The evidence and testimony offered at trial showed that Husband spent $939.49 on paramours; wired $2,475.80 to paramours; liquidated $10,794.44 from TD Ameritrade with no explanation of where those funds went; spent $62,819.27 [$22,027.41 + $40,791.86] on personal vacations with and without his paramours; and withdrew $39,518.82 from his marital account with no explanation. This evidence would have demonstrated that Husband had dissipated a total of $116,547.82 of marital funds.

(Extract references deleted.)

[28] Husband breaks down the amount as follows: "$6,746.87 on traveling with paramours," "wire transfers in the amount of $1,555.00 to other women," and "$775.39 on online dating websites."

i.e., used for a purpose unrelated to the marriage. The circuit court properly recognized that this was the issue.

When Wife attempted to introduce Exhibit 32, which was a table Wife compiled showing Husband's withdrawals from bank accounts in 2016 (with a couple of withdrawals in 2015) in the amount of $39,518.82, the court did not admit it into evidence. The court explained:

> [J]ust because somebody goes to an ATM and withdraws money from a joint account, doesn't mean that's a fund dissipation. It could be for brace adjustment for the kids, it could be for new tires, I don't know what it's for. So, and even if there's a supporting document in the back here, it doesn't, to show that it was withdrawn, I don't know how you quite tie this to the adultery thing here.

The court noted that the exhibit showed "a multitude of ATM withdrawals, which is a perfectly normal transaction," but Wife could not make a good faith showing that it was tied to adultery. It continued:

> So, if it's normal spending, if it's paying a bill or buying gas or lunch, I don't know what it's for. So, yes, there's a shifting of the burden once you establish a prima facie case of what it's for, but you can't, just handing it to me doesn't establish that and asking her is this his account, yes. Okay, well, great, but she can't establish what it's for either. So, you still have the burden of establishing the evidentiary purpose of the document, which I have yet to hear. That may happen, but right now, I haven't heard how it happened.

In finding that Wife failed to meet her burden of establishing a prima facie case of dissipation, the court erred. "Proof that a spouse made sizable withdrawals from bank accounts under his or her control is sufficient to support the finding that the spouse had dissipated the withdrawn funds." *Omayaka*, 417 Md. at 657. In this case, it was error for the court to find that Husband's withdrawal of approximately $39,000 in one year did not

39

establish a prima facie case of dissipation, given that Husband was earning a monthly

pension of more than $11,000, plus consulting fees.

Once a party makes out a prima facie case of dissipation, the burden shifts to the

other spouse to show that the expenditures were appropriate. *Hiltz v. Hiltz*, 213 Md. App.

317, 349 (2013); *Jeffcoat*, 102 Md. App. at 311–12. Thus, on remand, the court shall allow

Husband the opportunity to show that the $39,000 withdrawn from the bank account was

appropriate. If he submits such evidence, the court shall determine if Wife has met her

ultimate burden of persuasion that these funds were dissipated, and if so, factor that into its

decision regarding a monetary award.[29]

**5.**

**Pension**

Wife next challenges the court's disposition of the parties' pensions. In that regard,

the court addressed Wife's retirement benefits, as follows:

> Retirement (TSP): This property is titled in [Wife's] name and was obtained
> during the marriage. The value of this account is $342,155.00, as of
> November 17, 2016. Joint Exhibit 1. [Wife] withdrew about $200,000.00
> from this account to pay taxes owed and attorneys' fees. She applied for this
> under a hardship form and did not pay a penalty. Defendant's Exhibit #2 and

---

[29] Wife also presented Exhibit 29, which detailed travel expenses in 2016 in the amount of $22,027.41 and was admitted into evidence. This exhibit was separate from Exhibit 31, which included the $40,791.86 travel expenses that the court found to be dissipated funds. Wife contends that the court erred in excluding this $22,027.41 in travel expenses in the amount of dissipation. Wife, however, merely makes this bald assertion and provides no other argument or detail about this claim. Accordingly, we will not consider it. *See Rohrbeck v. Rohrbeck*, 318 Md. 28, 38 n. 4 (1989) (declining to address an issue that had "not been adequately briefed and argued"). *Accord Mohammad v. Toyota Motor Sales, U.S.A., Inc.*, 179 Md. App. 693, 697 n. 1 (2008) (same).

#3.[30]  Due to the fact that she withdrew a large sum from this account and that [Husband] shall be eligible to receive monthly benefits from [Wife's] Social Security Account, [Wife] shall retain the entire value of her retirement fund. . . .  She will also be receiving a monthly portion at $2,000.00 from [Husband's] World Bank pension (see below).  Therefore, the Court finds it to be fair and equitable for [Wife] to retain the full value of this property as her sole property.

Pension (FERS): This property is titled in [Wife's] name and was obtained during the marriage.  However, the Court is unable to determine the value of this property at this time as it is a pension that will be accessible at the time of [Wife's] retirement.  Therefore, it shall remain as an 'if, as, and when' fair market value . . . [and] shall be the sole property of [Wife].[31]

With respect to Husband's World Bank pension, the court noted that the World Bank policy was that it would divide an employee's pension only if it is pursuant to an order for spousal support.  Accordingly, the court stated that it would discuss spousal support in that context and not as a typical alimony determination.  The court stated:

> [Husband] has a pension with the World Bank fully earned during the entirety of the parties' marriage.  The Court shall order spousal support as a mechanism to achieve division of this marital asset.  Payments shall be made to [Wife] from [Husband's] pension account on a monthly basis, consistent with the policy of the World Bank.

*     *     *

> Mr. Hatfield discussed the case *Aleem v. Aleem* which stated that a parties' pension from the World Bank[] is marital property and the other party is "entitled to half of that pension and property under Maryland law."  404 Md. 404, 412 (2007).  Such is the case here.
>     [Husband] receives a gross monthly payment of $11,012.66.  [Husband] began working at the World Bank during the marriage and retired

---

[30] The documents the court referenced show that Wife made a hardship withdrawal from her TSP. Wife testified, however, that she did pay a penalty for this withdrawal.

[31] In the property schedule attached to the court's opinion, it listed the value of this pension as "if, as, and when" and put it in Wife's column of marital property with an amount "unknown."

during the marriage. The entire pension was earned during the marriage. Therefore, the pension amount is marital property and shall be divided. As the Court is allowing [Wife] to maintain her full amount of her Retirement (TSP) and [Husband] is able to collect under [Wife's] monthly Social Security benefit once [Wife] is of age, the Court finds it equitable that [Wife] receive payment in the monthly permanent amount of $2,000.00 from [Husband's] World Bank pension with the cost of living increase to be adjusted pro rata in addition to the monthly amount, as her share of [Husband's] pension.

Wife contends that the circuit court erred in failing to divide the parties' pensions on an "if, as and when" basis when there was no objection to distribution of the retirement benefits in that way. She asserts that, if the court had properly distributed the parties' pensions, she "would have received 50% of Husband's marital World Bank pension ($5,551.33 per month plus cost of living increases)." Wife requests that this Court "direct that the World Bank pension and the marital portion of [Wife's] FERS pension be distributed 'if, as and when,'" *nunc pro tunc* to the date of the original Judgment of Divorce."

Husband contends that, because he has a World Bank pension, it was not possible to divide it on an "if, as and when" basis. He asserts that the circuit court properly exercised its discretion in awarding Wife $2,000 per month, as opposed to the $5,551 she requested.

It is clear that "pensions or retirement benefits that accrue during a marriage constitute marital property." *Imagnu v. Wodajo*, 85 Md. App. 208, 212 (1996). Trial courts, however, "'are presented with a complex task in properly valuing and allocating" these benefits.'" *Rosenberg*, 64 Md. App. at 508 (quoting *Deering v. Deering*, 292 Md. 115, 129 (1981)).

42

The appellate courts generally have "shown great respect for the judgments of trial courts in choosing methods for valuing pension benefits in divorce proceedings." *Id.* at 215. In this case, however, it is not clear how the court arrived at the result of awarding Wife $2,000 of Husband's $11,102.66 monthly pension, particularly when the court indicated its intent that Wife receive half of the World Bank pension.[32] Although the court clearly was trying to balance Wife's retirement assets with the World Bank pension, in the absence of a value of these assets, it is impossible for this Court to determine the basis for this amount. Nor is it clear how this could be a proper resolution of the pension division considering the record in this case.

In *Dziamko v. Chuhaj*, 193 Md. App. 98, 111, *cert. denied*, 416 Md. 273 (2010) (quoting *Bloomer v. Bloomer*, 26 N.W.2d 235, 238 (Wis. 1978)), this Court noted three possible methods of valuing pension benefits at the time of divorce:

> First, a trial court could calculate the value of the member's contributions to the pension during the marriage, plus interest. Second, the court could attempt to compute the present value of the pension when it vests.[33] Third, the court could "'determine a fixed percentage for [the spouse] of any future payments [the pension recipient] receives under the plan, payable to [spouse] as, if, and when paid to [the pension recipient].'"

[32] As indicated, the court quoted the *Aleem* case for the proposition that an ex-spouse is entitled to half of a World Bank pension and then stated: "Such is the case here." We note this statement to show that the court's intent was to give Wife half of the pension here, not as support for the proposition that an ex-spouse is always entitled to half of a pension.

[33] Under the second approach, benefits payable in the future would have to be discounted for various factors, such as interest in the future, mortality, and vesting, and the benefits would "'have to be calculated with respect to the [ex-spouse's] life expectancy as a retiree.'" *Deering v. Deering*, 292 Md. 115, 130 (1981) (quoting *Bloomer v. Bloomer*, 267 N.W.2d 235, 241 (Wis. 1978)).

43

Under the third approach, it is not necessary to determine the value of the pension fund. *Deering*, 292 Md. at 130.

Here, there was no evidence of value regarding either Husband's World Bank pension or Wife's FERS pension. As Wife notes, however, FL § 8-204(b) provides:

> (1) The court need not determine the value of a pension, retirement, profit sharing, or deferred compensation plan, unless a party has given notice in accordance with paragraph (2) of this subsection that the party objects to a distribution of retirement benefits on an "if, as, and when" basis.

> (2) If a party objects to the distribution of retirement benefits on an "if, as, and when" basis and intends to present evidence of the value of the benefits, the party shall give written notice at least 60 days before the date the joint statement of the parties concerning marital and nonmarital property is required to be filed under the Maryland Rules. If notice is not given in accordance with this paragraph, any objection to a distribution on an "if, as, and when" basis shall be deemed to be waived unless good cause is shown.

Wife asserts, and Husband does not deny, that no notice was given that the value of Husband's World Bank pension was at issue. If no notice is given, any objection to an "if, as, and when" distribution is waived. *Caccamise v. Caccamise*, 130 Md. App. 505, 523, *cert. denied*, 359 Md. 29 (2000). Thus, pursuant to the statute, and in the absence of any evidence of the value of the pensions, Wife argues that an "if, as and when" distribution was the only option to divide the pensions.

Husband disagrees, asserting that such a disposition was not possible for a World Bank pension. Husband's expert testified, however, that as long as the order was styled as spousal support, the court could order that a percentage of his pension be distributed. An order that Wife receive 50% of husband's pension would be similar to an "if, as and when" order.

44

In the absence of value of the pensions, or agreement of the parties, the court could not properly set off one pension against another. The division of the parties' pensions, therefore, must be pursuant to the *Bangs* "if, as and when" analysis, or its equivalent, in the case of the World Bank pension. On remand, the court should apply that analysis and then assess how that, and Wife's TSP, relate to the monetary award.

## C.

### Sale of the Marital Home

Wife's next contention involves the court's order that the marital home be sold and the proceeds from the sale divided equally. The court's order stated, in pertinent part, as follows:

> ORDERED, that if the Trustee deems it financially prudent and necessary to make repairs to the property to maximize its fair market value to list it for sale, the costs of said repairs shall be shared equally; and it is further,
> ORDERED, that [Wife] and [Husband] shall continue to pay and keep current all liens on the property (including, without limitation, principal, interest, taxes, insurance, utilities, assessments, deferred water and sewer fees, and HOA or COA fees) through the date of settlement[.]

Wife contends that the circuit court "erred in effectively ordering Wife to subsidize Husband's living expenses." She asserts that, by ordering Wife to "contribute to repairs, carrying costs, and taxes on the former marital home, where Husband had resided, alone since the parties' separation," the court "effectively award[ed] Husband monthly spousal support (which he had never requested)."

45

Husband disagrees. He asserts that, because "both parties possessed an interest in the marital home, and the proceeds were to be equally divided upon sale, it was equitable to require both to cover the costs to facilitate its sale."

"Generally, one co-tenant who pays the mortgage, taxes, and other carry charges of jointly owned property is entitled to contribution from the other." *Crawford v. Crawford*, 293 Md. 307, 309 (1982). "Crawford credits" apply "the general law of contribution between cotenants of jointly owned property" to married parties when they separate. *Gordon v. Gordon*, 174 Md. App. 583, 641 (2007). "A married, but separated, cotenant is, in the absence of an ouster (or its equivalent) of the nonpaying spouse, entitled to contribution for those expenses the paying spouse has paid." *Id.* (quoting *Baran v. Jaskulski*, 114 Md. App. 322, 332 (1997)).

A trial judge is not obligated, however, to award contribution at the time of divorce. *Id.* at 641. Rather, contribution "is an equitable remedy within the discretion of the court." *Id.* at 642. *Accord Imagnu*, 85 Md. App. at 223.

Wife states in her brief that Husband "essentially ousted" her from the home, asserting that Husband's "adultery forced" her to leave. Husband contends that Wife "was never ousted from the marital home," but rather, she voluntarily left the home with their minor son, without notice or his consent.

We agree with Husband that Wife was not "ousted" from the home. "Ouster is the actual turning out or keeping excluded the party entitled to the possession of any real property." *Gordon*, 174 Md. App. at 642. Here, Wife testified merely that she moved from the marital home in April 2015. There was no evidence of an ouster.

46

Based upon all of the evidence, we perceive no abuse of discretion by the circuit court in ordering that the parties share the costs of any liens on the property and any necessary repairs pending the sale of the home, at which time the proceeds would be divided equally.

## III.

### Attorneys' Fees

Wife contends that the circuit court "abused its discretion in declining to award [her] attorneys' fees." She raises several claims of error in this regard: (1) the court applied an incorrect legal standard in finding that there was a "lack of substantial justification" on the part of both parties due to their failure to settle the case"; (2) the court's determination that Wife did "not have a financial need for attorneys' fees was inconsistent with [its] findings"; and (3) the court erred by disregarding "the delayed and prolonged proceedings caused by discovery failures[,] and postponement of the trial."

Husband contends that the circuit court did not abuse its discretion in denying both parties' requests for attorneys' fees. He notes that Wife incurred approximately $425,000 in attorneys' fees, as compared to his total fees of $189,235.82. He asserts:

> In light of the straight-forward issues, the attorney's fees incurred by [Wife] are shocking. The handling of the matter did not need to be as litigious and as costly as it was. And, the [circuit c]ourt recognized the same in saying that this case did not need to proceed in the fashion in which it did.

Finally, Husband disputes that he delayed or prolonged the proceedings, and he discusses multiple actions taken by Wife to support his argument that Wife took "unreasonable positions" during the litigation.

47

In determining whether to award attorneys' fees, the court must consider the financial resources and financial needs of both parties and whether there was substantial justification for prosecuting or defending the proceeding. *See* FL § 7-107 (concerning a judgment of divorce) and § 8-214 (concerning marital property awards). The decision whether to award attorneys' fees is within the discretion of the trial court. *Petrini v. Petrini*, 336 Md. 453, 468 (1994). The court's decision in this regard "should not be reversed on appeal unless the ruling was arbitrary or clearly incorrect or both." *Huntley v. Huntley*, 229 Md. App. 484, 497 (2016).

Here, in addressing both Wife's and Husband's request that their attorneys' fees be paid by the other party, the court noted that it was required to consider both the financial resources and financial needs of both parties, as well as whether there was substantial justification for prosecuting or defending the proceeding. The court declined to award attorneys' fees to either party, stating:

> In the present case, the financial resources and the financial need of both parties was discussed in detail [above]. Both parties have financial resources, including income and other financial resources, and do not have a financial need, as they are able to support themselves. However, there is no substantial justification for either party to have prosecuted or defended the proceeding in the fashion they have, as the time that it took for them to get to trial and to go through trial, shows that they also had ample opportunity and ability to settle this case. A simple numbers comparison between the values of some of their assets to the litigation costs evidence unwillingness by both, [Wife] and [Husband], to resolve these issues expeditiously, instead choosing to engage in protracted litigation.

The court ruling clearly reflected a concern that the parties had chosen "to engage in protracted litigation," as opposed to resolving the issues expeditiously. This concern is consistent with the arguments each party makes against the other. Under these

48

circumstances, and where the court clearly considered the financial resources and financial needs of each party,[34] we cannot conclude that the court abused its discretion in denying Wife's request for attorneys' fees.

## IV.

## Ground for Divorce

Finally, Wife contends that the trial court "erred in failing to grant an absolute divorce on the grounds of adultery." She asserts that she never requested a divorce on the ground of a one-year separation, and it was error for the court to award her a divorce "on grounds never plead[ed] by Wife and deny her a divorce based on adultery which Husband admitted."

Husband contends that the circuit court "did not abuse its discretion in granting the parties a divorce on the grounds of a one-year separation." He asserts that the court "made findings to support the award of divorce on the grounds of a one-year separation which were not erroneous." In any event, he argues that any error was harmless.

As the circuit court noted, FL § 7-103 provides various grounds on which a court may grant a divorce. FL § 7-103(a)(4) permits a court to grant an absolute divorce on the ground of a 12-month separation "when the parties have lived separate and apart without cohabitation for 12 months without interruption before the filing of the application for divorce."

_____

[34] In assessing the financial needs of the parties, the court was aware that Wife had already taken $200,000 out of her retirement account to pay attorneys' fees, and she would get half of the proceeds of the marital home, which Husband valued at $1,070,650, when it was sold.

In deciding to grant Wife an absolute divorce based on a one-year separation, the court noted that both parties testified that they had lived separate and apart since April 2015, approximately 19 months prior to the start of trial in December 2016. The court then stated:

> [Wife] asks this [c]ourt to find an absolute divorce on the grounds of adultery. [Husband] asks this [c]ourt to find an absolute divorce on the ground of one-year separation. Maryland requires only one ground to be met for an absolute divorce to be issued, and in the present case, the ground met was that of a 12-month separation.

In *Welsh v. Welsh*, 135 Md. App. 29 (2000), *cert denied*, 363 Md. 207 (2001), this Court upheld the grant of a divorce based on a two-year separation, even though wife had requested a divorce based on an allegation of adultery. We stated:

> It is ultimately up to the court, based on its fact finding, to declare the grounds for divorce. It is not reasonable that the court be obligated to grant the divorce on the grounds requested when the judge is more persuaded that it is more likely than not that other grounds for the divorce are more justified.

*Id.* at 38.

As indicated, Wife's contention of error is that she did not request a divorce on the ground of a one-year separation, not that the evidence did not support that finding.[35] Based on the rationale of *Welsh*, we conclude that the court did not err in awarding Wife a divorce based on a one-year separation. And even if there was error, Wife has not shown prejudice

---

[35] Husband filed his Third Amended Counter-Complaint for Absolute Divorce on November 14, 2016, more than one year after Wife moved out of the marital home.

where the court discussed Husband's adultery in determining the equitable distribution of property and Wife wanted the divorce. Wife states no claim for relief in this regard.

**APPELLEE'S MOTION TO DISMISS DENIED. JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED, IN PART, AND VACATED, IN PART. ORDER GRANTING AN ABSOLUTE DIVORCE, REQUIRING WIFE TO PAY COSTS FOR THE HOME UNTIL SOLD, AND DENYING WIFE'S REQUEST FOR ATTORNEYS' FEES AFFIRMED; JUDGMENT OTHERWISE VACATED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**